IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| MALCOLM CLIFTON DAVENPORT,<br><br>    Appellant,<br><br>v.<br><br><br>FRONTIER BANK,<br><br>    Appellee. | **Bankruptcy Appeal**<br><br>Case No. 3:11-cv-642-MEF<br>(WO—Do not publish) |

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

This cause comes before the Court on an appeal taken from the United States Bankruptcy Court for the Middle District of Alabama. After a trial, Bankruptcy Judge Dwight Williams held that the debt incurred by the appellant, Malcolm Davenport, was non-dischargeable. For the reasons discussed below, this decision is due to be AFFIRMED.

### II. JURISDICTION

United States District Courts have jurisdiction to hear appeals from "final judgments, orders and decrees" issued by bankruptcy courts. 28 U.S.C. § 158(a)(1).

1

Typically a final judgment obtains when a decision "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Catlin v. United States*, 324 U.S. 229, 233 (1945). In the bankruptcy context, however, the concept of finality is more flexible: "it is generally the particular proceeding *or controversy* that must have been finally resolved, rather than the entire bankruptcy litigation." *Charter Co. v. Prudential Ins. Co.* (*In re Charter Co.*), 778 F.2d 617, 621 (11th Cir. 1985) (emphasis added).

### III. BACKGROUND[1]

**A.     Malcolm Davenport, Frontier Bank, and their banking relationship**

Malcolm Davenport, V ("Davenport"), hails from the Valley area in Alabama. He graduated from college with an accounting degree and then worked for a few years as an accountant. In 1978, he decided to return to school, and so he enrolled at Cumberland School of Law. After graduating three years later, he spent a year trying to earn an L.L.M. in tax at Miami School of Law before heading off into private practice. He was admitted to the Georgia and Alabama bars and wound up practicing for about two years.

Around 1994 or 1995, he shared an accounting practice, but he only did so as an accommodation to his partner. He did not himself practice. By 1999, he had no staff at the accounting firm other than a consultant who helped him pay the bills. Meanwhile, he served on the board of a number of privately-held companies and directed some family-owned businesses and telephone companies in the Valley.

---

[1] The facts are taken almost wholesale from Judge Williams's Memorandum Opinion (Doc. # 3-3.)

In 1997, Davenport and his wife began building a home in Lanett, Alabama. To this end, he borrowed $150,000 from Frontier Bank ("Frontier")[2] on November 20, 1997. The parties memorialized their relationship by way of a promissory note that contained the loan amount and Davenport's promise to repay in full. Less than a year later, the parties agreed to increase the loan to $1,002,348. Davenport signed and delivered a mortgage to Frontier to secure repayment under a newly executed promissory note. Frontier then promptly recorded the mortgage in the Chambers County, Alabama, probate office. About eight months later, the parties agreed once again to modify their agreement, this time executing a promissory note that increased the loan amount to $2,500,000. And just seven months after that, on March 16, 1999, Davenport and Frontier agreed to increase the loan to $3,000,000. This required Davenport to take out a second mortgage on the home, which Frontier again recorded promptly.

**B.  Davenport's financial statements**

All told, the parties renewed the loan 23 times from November 1997 to October 2009. Each time a renewal took place, a loan officer with Frontier would prepare a credit memorandum summarizing the information that Davenport had submitted on his most recent personal financial statement.[3] The document would also include the bank's

---

[2] Davenport technically borrowed the money from Frontier Bank's predecessor, Valley National Bank of Lannett, Alabama, which merged with First National Bank of Sylacauga to become Frontier Bank. For simplicity's sake, the Court has referred to the loan originator as Frontier Bank throughout this Memorandum Opinion.

[3] An accountant drafted Davenport's first financial statement. He prepared the other seven.

explanation of the loan, the borrower's history with the bank, a breakdown of the loan, a discussion of the borrower's ability to repay, a valuation of the collateral used to secure the loan, and a recommendation about whether to renew the loan. On top of that, Frontier would sometimes prepare a loan approval request during the loan renewal process. The loan officer would use the request to relay to his superiors any information he knew or had learned about Davenport's assets and liabilities in summary form.

Davenport provided Frontier with eight financial statements during the twelve-year life of the loan.[4] His first financial statement revealed that he and his wife had $7.7 million in assets and $947,000 in liabilities for a net worth of $6.85 million. His assets included about $5 million in securities of publicly traded and closely held companies and $2.3 million in real estate. He listed an ownership interest in 25 companies, including over $1 million worth of stock in ITC DeltaCom, Inc., and over half a million dollars in each of two other companies.

Davenport's second financial statement, which he submitted in February of 1999, stated that he had $11 million in assets and $4.7 million in liabilities for a net worth of $6.6 million. A year later he submitted his third financial statement, which showed that he had $17 million in assets and $3.6 million in liabilities. The increase in assets was attributable to an increase in value of the various stocks he held, a jump in real estate values, and an outstanding $3 million loan he made to Spintek Gaming Technologies.

---

[4] Under the bank's policy, a debtor would have to file a new financial statement at least once every 15 months.

The increase in his outstanding liabilities was due mainly to the growth in the amount of the loan made to him by Frontier.

By March 2002, when Davenport filed his fourth financial statement, his situation had deteriorated significantly. He still had $13 million in assets, but his liabilities had ballooned to $8.5 million. This brought his net worth down to $4.4 million. Looking behind the financial statements reveals that the value of the stock of the publicly traded companies he held had plummeted from $7.8 million to $156,400. The value of his "receivables and licenses" had increased to $5.8 million, however. The increase in his liabilities came by way of a $3.9 million personal guaranty he made on a loan by RBB, an Austrian bank, to his family trust.

Davenport's fifth financial statement, which he filed in December of 2002, listed $14 million in assets, $4.8 million in liabilities, and a $9.6 million net worth. The value of his securities had once again declined, but the value of his receivables and royalties account had increased to $7 million. He omitted the previously listed personal guaranty obligation of $3.9 million that he owed to RBB.

Davenport's finances did not improve over time. His November 2005 financial statement, his sixth, listed $8 million in assets, $5 million in liabilities, and a $3 million net worth. The value of his securities had dropped to just $57,900. The credit memorandum prepared by Frontier in November of 2006 shows that the status of Davenport's loan changed sometime during the year. It states: "This loan has been a

classified credit in the bank for quite some time because of the lack of repayment and the reduction in collateral value. A principal reduction is expected at the next renewal." Davenport had made only interest payments up to that point, and the bank would not have continued renewing his loan but for those payments.

His seventh financial statement, filed in July of 2007, listed $4.9 million in assets. He had liabilities in an almost equal amount. His net worth was only $28,817, and his Frontier-financed house stood as his chief asset and chief liability. In September of 2009, his eighth and final financial statement revealed that Davenport's $5.7 million in liabilities outstripped his $4.9 million assets, giving him a net worth of negative $773,417. By October of 2009, Davenport became past due on his interest payments. The principal balance on the loan was $2.85 million at the time.

C.   **Davenport's undisclosed financial information**

   1.   **Davenport's debts**

Davenport had a tax liability arise in 1998, shortly after Frontier made its initial loan to him. The IRS, as a result of this outstanding tax liability, filed a lien against Davenport in November of 2002. The liens covered almost $900,000 in taxes stretching back to 1998. The liens encumbered the house, which Davenport had used as collateral for the loans provided by Frontier. In mid-2002, Davenport disclosed this tax liability to the bank—four years after the initial loan. He did not disclose any of his tax liabilities on a financial statement until September 11, 2009, the date on which he filed his last one.

Davenport also had an outstanding debt owed to RBB, an Austrian bank. This debt was by no means insignificant: Davenport owed RBB a couple million dollars.[5] Yet he did not list the RBB debt on a financial statement submitted to Frontier until 2002. Nor did he settle the debt before then. In fact, it wasn't until December of 2003 that he entered into a settlement agreement with RBB, and even then, he only partially settled the debt; he still owed $700,000 after the settlement. He failed to mention this fact to Frontier or disclose the $700,000 debt on future financial statements. Davenport also remained liable on a $5 million obligation to RBB's successor, and he failed to disclose this liability to Frontier, too.

2.  **Davenport's contingent liabilities**

Davenport personally guaranteed the debts of Clifcoe and Sunset Land Holdings, two companies in which he had an interest. The guaranty of Clifcoe's debt exceeded several million dollars.[6] Davenport testified at trial that he did not know that he had to list contingent liabilities on his financial statement and that Frontier never asked him about any. He further stated that because Clifcoe was "doing well and building," and since he

---

[5] There is some confusion in the briefs and the bankruptcy court's opinion about the exact nature and extent of the RBB debt. It appears from the various court documents that the debt owed to RBB was incurred by the Davenport family trust and personally guaranteed by Malcolm Davenport, and that the proceeds were then re-lent to a gaming company. Without delving too far into the details, what is important here is that the debt guaranteed by Davenport arose before the 2002 financial statement he filed (in which he listed the liability) and remained outstanding even after he filed his 2003 financial statement that made no mention of the liability.

[6] There was no evidence in the record about the value of the Sunset Holdings debt that Davenport guaranteed.

did not know how to report a guaranty, he did not list the obligation on his financial statement. He also testified that he did not think he needed to list the obligations because the property serving as collateral exceeded the debt incurred.

**D.      Procedural history**

Frontier filed an adversary proceeding on April 30, 2010, in the Bankruptcy Court for the Middle District of Alabama. After a trial on the matter, the bankruptcy court found Frontier Bank's claim against Davenport non-dischargeable. The bankruptcy court hinged its decision on how Davenport failed to disclose his tax liabilities, misrepresented the status of the RBB debt he owed, and failed to disclose other debts and liabilities material to his financial condition. Davenport filed a timely notice of appeal regarding the bankruptcy court's decision on July 8, 2011.

## IV. STANDARD OF REVIEW

A district court reviews a bankruptcy court's legal conclusions de novo and factual findings for clear error. *See Enron Corp. v. New Power Co.*, 438 F.3d 1113, 1117 (11th Cir. 2006); *Jet Florida, Inc. v. Am. Airlines, Inc.* (*In re Jet Systems, Inc.*), 861 F.2d 1555, 1558 (11th Cir. 1988).

## V. DISCUSSION

Generally speaking, the Bankruptcy Code allows a debtor experiencing financial hardship to get a fresh start. To this end, it allows for the discharge of the debtor's debts by extinguishing all or some of his creditors' claims. But this general rule has exceptions. For example, a debt is non-dischargeable when a debtor, with the intent to defraud, induces a creditor to lend to him by making materially false statements about his financial condition when the creditor reasonably relies on the accuracy of those statements. In this scenario, the inducing debtor seeking protection from a defrauded creditor's claims will get no help from the federal courts. *See* 11 U.S.C. § 523(a)(2)(B).

Yet courts construe exceptions to the rule of discharge narrowly, favoring the debtor over the objecting creditor as a first principle. *Schweig v. Hunter* (*In re Hunter*), 780 F.32d 1577, 1579 (11th Cir. 1986), *abrogated on other grounds*, *Grogan v. Garner*, 498 U.S. 279 (1991). Hence an objecting creditor must prove each element by a preponderance of the evidence. *Grogan*, 498 U.S. at 291. A failure to do so makes the debt dischargeable.

Davenport contends that Frontier Bank failed to shoulder its burden, claiming the bankruptcy court erred by concluding he could not discharge the debt he owed to Frontier. More specifically, Davenport argues that Frontier failed to prove that he intended to defraud the bank by a preponderance of the evidence, that minimal investigation would have revealed the true state of his financial affairs, and that Frontier disregarded numerous red flags contained in his financial statements.

### A.   Davenport made materially false representations

A false statement meets the materiality requirement if it is "significant in both amount and effect on the creditor receiving the financial statement." *Citizens Bank v. Wright* (*In re Wright*), 299 B.R. 648, 659 (Bankr. M.D. Ga. 2003) (quoting *Enter. Nat'l Bank of Atlanta v. Jones* (*In re Jones*), 197 B.R. 949, 955 (Bankr. M.D. Ga. 1996) (internal quotations omitted)). In other words, "[t]he information must have actual usefulness to the creditor and must have been an influence on the extension of credit." *Id.* (quoting *Jones*, 197 B.R. at 955). Here, Davenport made a number of materially false representations on the financial statements he submitted to Frontier Bank by failing to disclose his tax liabilities and the RBB debt he had personally guaranteed. And Frontier's executives—namely, Steve Townson and Jimmy Yates—testified that the information in the financial statements influenced the bank's decision to extend credit to Davenport.[7] Because the parties do not dispute these two facts, the bankruptcy court did not err by holding that Davenport made materially false statements, in writing and respecting his financial condition, to Frontier Bank.

### B.   The bankruptcy court did not err by finding Frontier's reliance reasonable

---

[7] In fact, Townson testified that Frontier does not lend money to people with outstanding IRS liabilities due to the risk involved.

Case 3:11-cv-00642-MEF   Document 10   Filed 07/05/12   Page 11 of 18

"Reasonable reliance analysis is done on a case-by-case basis considering the totality of the circumstances." *Wright*, 299 B.R. at 659. The first part of the analysis is subjective—it asks whether the creditor actually relied on the financial statement. *Jones*, 197 B.R. at 961. If the creditor did so rely, the court moves onto the second part of the test, which asks whether the reliance was reasonable. *Id.*

The bankruptcy court held that Frontier reasonably relied on Davenport's representations. In support of this holding, the court found that the bank reviewed each one of Davenport's financial statements, asked him questions about his disclosures, and had ongoing and extensive discussions with him about the state of his finances. (Doc. # 3-3 at 21.) Frontier Bank even drafted a credit memorandum incorporating this information for its internal use. (*Id.*) Moreover, the bankruptcy court found that a number of factors gave Davenport's representations extra credence: he is a certified public accountant and a licensed attorney, he began course work on an L.L.M. in taxation, he sat on the board of directors for a number of companies, and his family's sterling reputation in the community preceded him. (*Id.* at 22.)

1.   **Actual reliance**

The bankruptcy proceeding produced sufficient evidence of Frontier's reliance on Davenport's representations. Steven Townson and Jimmy Yates, Frontier's executives, testified that the bank relied on Davenport's financial statements. And although the bank relied on other factors as well, including Davenport's education, training, and family

11

history, it did "not have to demonstrate that a financial statement was the only factor influencing its credit making decision," because "[p]artial reliance is all that is needed." *First Commercial Bank v. Robinson* (*In re Robinson*), 192 B.R. 569, 576 (Bankr. N.D. Ala. 1996). Townson and Yates's testimony thus provided the bankruptcy court with ample leeway to find actual reliance on the part of Frontier Bank.

### 2.     **Reasonableness**

The objective reasonableness prong asks what an average and ordinary person would do under the circumstances. *See City Bank & Trust v. Vann* (*In re Vann*), 67 F.3d 277, 280 (11th Cir. 1995). This places some responsibility on the creditor to make sure it has good reason to rely on the debtor's representations. *Id.* (citing *First Bank of Colorado Springs v. Mullett* (*In re Mullet*), 817 F.2d 677, 679 (10th Cir. 1987)). Relevant questions include:

- Would previous business dealings have created a relationship of trust between the parties?

- Should the creditor have noticed red flags that would have tipped off an ordinarily prudent person?

- Would minimal investigation by the creditor have revealed the falsity of the debtor's representations?

- Did an error appear on the face of the financial statement?

*See, e.g.*, *Vann*, 67 F.3d at 280–81 (quoting *Coston v. Bank of Malvern* (*In re Coston*), 991 F.2d 257, 261 (5th Cir. 1993) (en banc)); *Mester v. Brevard* (*In re Brevard*), 200 B.R. 836, 845 (Bankr. E.D. Va. 1996); *see generally* Michael J. Lichtenstein,

*Non-dischargeability of Debts Under Section 523(a)(2)(B) of the Bankruptcy Code*, 126 Banking L.J. 529, 532 (2009).

Creditors, however, generally do not have to undertake an independent investigation to verify the information on a debtor's financial statement. See Lichtenstein, *Non-dischargeability*, *supra*, at 531. For instance, in *Riggs National Bank of Washington v. Ross* (*In re Ross*), the debtor did not escape liability even though his financial statement contained intentional misstatements that the bank failed to investigate. 180 B.R. 121 (Bankr. E.D. Va. 1994). And in *Global Express Money Order v. Davis* (*In Re Davis*), 262 B.R. 673 (Bankr. E.D. Va. 2001), a debtor intentionally misrepresented the value of one of his checking accounts, some real estate he owned, his mutual funds, and a tax refund. The bank, although it used a third-party credit report, relied on the financial statements provided by the debtor. The court held this reliance was reasonable, and the creditor had no duty to inquire further. 262 B.R. at 679.

The Court cannot say that the bankruptcy court erred by finding Frontier's reliance reasonable. A creditor can establish its reasonable reliance by showing it complied with industry custom when investigating the debtor's financial condition. *See Wright*, 299 B.R. at 659–60; *Jones*, 197 B.R. at 961. Here, both Townson and Yates testified that Frontier typically evaluated and relied on financial statements submitted by their clients, and that this amounted to a customary banking procedure. Frontier's compliance with industry norms in its dealings with Davenport, consequently, supports the bankruptcy

13

court's decision. What is more, Davenport's education and training as a lawyer and accountant put him in almost as good a position as the banking professionals extending and servicing his loan to know they would rely on his financial statements in making business decisions. The bankruptcy court properly took this factor into account, *see Jones*, 197 B.R. at 953; *First Nat'l Bank of Central Ala. v. Moore* (*In re Moore*), No. 07-cv-70948, 2010 WL 1880573, at *1 (Bankr. N.D. Ala. May 6, 2010), and correctly determined that it weighed in favor of Frontier.

Davenport attempts to overcome the fact that numerous indicia of reasonableness weigh in Frontier's favor by claiming the bank ignored a number of red flags. He asserts that Frontier ignored the absence of Davenport's tax returns early on; missed patent errors on the financial statements; overlooked the disappearance of assets and the appearance of liabilities; neglected to ask for Mrs. Davenport's financial information; and never questioned the volatile increases and decreases in his net worth. But the bankruptcy court did not err by discounting these supposed anomalies. As to the bank's initial failure to ask for Davenport's tax returns, Frontier did not normally ask for that information early in the life of a loan, and without evidence of a contrary industry norm, the bankruptcy court had ample leeway to find that this failure was not unreasonable. Banks, moreover, have no duty to perform independent investigations into the truthfulness of financial statements submitted by debtors. *See Vann*, 67 F.3d at 280–81; *Gordon*, 277 B.R. at 810; *Robinson*, 192 B.R. at 578. Despite having no duty to inquire further,

Frontier asked for verification of Davenport's creditworthiness from third parties, and the credit reports the bank obtained confirmed Davenport's financial statements. This made the bank's reliance on Davenport's representations all the more reasonable. *See Robinson*, 192 B.R. at 577.

In addition, Yates testified that he questioned Davenport whenever he needed an explanation about an entry on one of his financial statements. Frontier even included some of Davenport's answers to follow up questions in its credit memorandums. For example, the June 2008 memorandum states that the "customer has reportedly resolved [his] tax issues." Townson and Yates also both testified that Davenport told them he had discharged the RBB debt in December of 2003, even though the debt had not in fact been settled. This would explain why the liability was not listed on financial statements from that point forward, thereby absolving Frontier of the duty to investigate further. The bankruptcy court therefore did not err when it discounted some of the patent discrepancies and latent inconsistencies on Davenport's financial statements. Indeed, they were largely explained away by Davenport with renewed misrepresentations to Townson and Yates.

Finally, Davenport's argument that the volatile valuations of his closely held companies were red flags lacks merit. Not only did the bank have no other way to value the companies than to rely on Davenport's representations, but it also likely knew that the value of a business interest can ebb and flow over time. Because Frontier had no better

15

way to get information than to rely on Davenport, and seeing how it knew about Davenport's education and experience in business and accounting, Frontier arguably acted reasonably by relying on the financial statements Davenport submitted. Accordingly, the bankruptcy court did not err here, either.

**C.     The bankruptcy court did not err in finding Davenport had fraudulent intent**

"A debtor will rarely admit that he intended to deceive a creditor." *Consolidated Bank & Trust v. Dalton* (*In re Dalton*), 205 F.3d 1332 (4th Cir. 2000) (unpublished table decision). So courts look to see whether they can infer fraudulent intent from the totality of the circumstances surrounding the debtor's acts. *Equitable Bank v. Miller* (*In re Miller*), 39 F.3d 301, 304 (11th Cir. 1994). Hence a debtor's "[r]eckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation may combine to produce the inference of intent [to deceive]." *Id.* at 305 (citations omitted). Relevant too is a debtor's "knowing renewal of a misrepresentation," which can "lead to the conclusion that a debtor intended to deceive." *Citizens Bank v. Wright* (*In re Wright*), 299 B.R. 648, 660 (Bankr. M.D. Ga. 2003) (internal citations omitted). Perhaps most importantly at the appeal stage, the question of a debtor's fraudulent intent "is an issue of fact" for the bankruptcy court, *Miller*, 39 F.3d 301, and thus the bankruptcy court's decision is presumed correct absent a showing of clear error. *See Enron Corp. v. New Power Co.*, 438 F.3d 1113, 1117 (11th Cir. 2006).

The bankruptcy court held that Davenport had fraudulent intent. To support this conclusion, the court relied on "the sheer magnitude of the amounts involved, the repeated omissions on subsequent financial statements, and [Davenport's] oral statements to the bank." (Doc. # 3-3 at 24.) The Court sees no reason to disturb this conclusion. The evidence at trial showed that Davenport owed RBB millions of dollars before Frontier ever loaned him any money, yet he failed to disclose this obligation until March 2002. And once Davenport disclosed the debt, it quickly disappeared, which prompted Frontier to ask him about it. He responded that it had been settled. But this wasn't true: while the majority of the RBB debt had been assigned to another entity, he remained liable for $700,000 of it. Furthermore, the bankruptcy court did not rely solely on these omissions; to the contrary, Judge Williams considered Davenport's failure to disclose his tax liabilities too. This, along with his misrepresentation of the nature of the RBB debt and his failure to disclose that he personally guaranteed the debts of Clifcoe and Sunset Holdings, is sufficient evidence to support the bankruptcy court's finding of fraudulent intent.

## VI. CONCLUSION

The bankruptcy court properly found Malcolm Davenport's debt to Frontier Bank non-dischargeable under 11 U.S.C. § 523(a)(2)(B). Accordingly, the bankruptcy court's decision is hereby AFFIRMED.

Done this the 5th day of July, 2012.

/s/ Mark E. Fuller
UNITED STATES DISTRICT JUDGE